Filed 4/4/13  P. v. Jaimez CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B235373 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA371027) |
| v. | |
| ANGEL ALEZ JAIMEZ et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of the County of Los Angeles, Ronald H. Rose and Kathleen Kennedy, Judges.  Affirmed as modified.

Susan E. Nash, under appointment by the Court of Appeal, for Defendant and Appellant Angel Alez Jaimez.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant Ernie Gonzalez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Viet H. Nguyen, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

Defendant and appellant Ernie Gonzalez was convicted of murder (Pen. Code, § 187, subd. (a)[1]) and willful, deliberate and premeditated attempted murder (§§ 664 and 187, subdivision (a)). Defendant and appellant Angel Alez Jaimez was convicted of false imprisonment by violence (§ 236) and dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)). On appeal, both defendants contend that the trial court erred in admitting expert testimony of prior shootings among members of their gang. In addition, Gonzalez contends that the trial court violated his right to confrontation under the Sixth Amendment by admitting hearsay evidence as a basis for the testimony of prosecution's gang expert and erred by imposing an unauthorized sentence term of "15 years to life" on his conviction for attempted murder, and that the abstract of judgment should be amended to reflect correctly the jury's true finding on the firearm use enhancements. Jaimez contends that there is not substantial evidence to support the jury's true findings for the gang enhancements and that the trial court erred in failing to provide him with presentence conduct credit.

We order that Gonzalez's abstract of judgment be corrected by stating that he is sentenced on count 2 to a life term with a 15 year minimum eligible parole date, and the firearm use enhancements are imposed under section 12022.53, subdivision (d), and Jaimez's abstract of judgment be corrected to provide that he is entitled to presentence conduct credit. We otherwise affirm the judgments.

---

[1]     All statutory citations are to the Penal Code unless otherwise noted.

# BACKGROUND

## A.     Factual Background

### 1.     *The Murder of Griselda Marcelo and the Attempted Murder of Bonifacio Marcelo* [2]

     a.     Prosecution Evidence

Little Valley is a criminal street gang operating in East Los Angeles. Bonifacio Marcelo testified that when he was 13 years old, he was a member of Little Valley. His sister, Griselda Marcelo,[3] was not a member of Little Valley.

Bonifacio testified that he lived with his parents and Griselda and that their residence was within Little Valley's territory. When Bonifacio was 19 years old, he decided that he no longer wanted to be a member of Little Valley, but to leave Little Valley he needed to obtain permission from the well-respected members of the gang. Bonifacio never obtained that permission, and he moved to Las Vegas for approximately three years. Around April 2008, Bonifacio moved back to Los Angeles and lived with his parents and Griselda again.

Bonifacio testified that he was familiar with high-ranking members of Little Valley. On October 16, 2008, Bonifacio spoke to "Nani," a "vetereno" and the oldest member of Little Valley. Nani asked Bonifacio if Bonifacio knew of a person who sold guns because Nani needed one for his nephew, Jaimez, because Jaimez had just been released from jail. Bonifacio responded that he did not know where to buy a gun.

---

[2]     As discussed *post*, there were two trials. The first trial concerned both defendants, and at the conclusion of that trial the trial court declared a mistrial as to these counts (counts 3 and 4)  Gonzalez was retried on them. The facts in this section, therefore, are taken from Gonzalez's retrial.

[3]     Because Griselda Marcelo and Bonifacio Marcelo share the same surname, we refer to them by their first names.

Bonifacio did not know that it was a sign of disrespect to say no to a veteran, and he was not trying to disrespect Nani when he responded.

Bonifacio testified that Jaimez was a member of Little Valley and that his moniker was "Vago." Los Angeles County Sheriff's Department Detective Ignacio Lugo, the prosecution's gang expert, testified that Gonzalez was a "shot caller" (one who dictates certain activities) and a high-ranking, well-respected member of Little Valley, and his moniker was "Big Sneaks." Gonzalez had several gang-related tattoos, including "LV" tattooed on his chest and "Eastside" tattooed on his stomach.

Bonifacio testified that on October 17, 2008, at approximately 12:00 noon, Bonifacio and Griselda left their home together. About 20 minutes later, they met some of Griselda's friends at the intersection of Eastman Avenue and Princeton Street, and a white Toyota and a red Intrepid were driven by them. After Griselda finished talking with her friends, Bonifacio and Griselda began walking again. The white Toyota and a red Intrepid returned and passed by them again. Griselda pointed to the driver of the white Toyota and said, "Look. There's homie Vago." The white Toyota and a red Intrepid made a u-turn, drove toward Bonifacio and Griselda again, and stopped. Bonifacio saw Jaimez, who was driving the Toyota, and Gonzalez, who was in the passenger seat of the Toyota.

Bonifacio testified that Gonzalez asked him, "Where you from?" and pulled out a chrome colored revolver. Bonifacio replied, "No where" [*sic*].

Detective Lugo testified that when a gang member asks another member, "where you from?," the other gang member is expected to claim his gang. The question Gonzalez asked Bonifacio means, "Are you loyal to [Little Valley]?" If the other gang member responds "nowhere," it is "very disrespectful." A person telling a gang member that he is no longer part of the gang may be considered more disrespectful than just moving out of the neighborhood. If a person states that he is no longer part of the gang, the gang would retaliate against him, including the person being physically assaulted, shot, or killed.

4

Bonifacio testified that in response to his stating, "No where" [*sic*]. Gonzalez stated, "Fuck Little Valley" and started shooting. Bonifacio ran behind a truck but he was shot in the left leg. Griselda fell to the ground. Los Angeles County Coroner's Office Medical Examiner Ajay Panchal testified that Griselda sustained two fatal gunshot wounds. Bonifacio testified that the Toyota and Intrepid were driven away immediately after the shootings.

Bonifacio testified that sheriff's deputies arrived at the scene of the shootings, but Bonifacio "didn't say anything" to them about the shooting because he feared further retaliation if he did so. Once Bonifacio learned that Griselda had died, he told the police what had occurred. Los Angeles County Sheriff's Department Detective James Charles testified that a murder weapon was never found.

Detective Charles testified that on October 19, 2008, a 911 call was made to the East Los Angeles County Sheriff's Department by Manuel Robles from a residence located on South Record Street. Robles testified that the residence belonged to his father. The audio recording of a 911 call was played for the jury. During the 911 call, Robles requested that deputies be dispatched to the 400 block of South Record Street because "there's a gang member that you guys have been wanting to get . . . hanging around." Robles stated that Gonzalez, who Robles identified as a Little Valley gang member, was loitering in the area. Detective Lugo testified that the 400 block of South Record Street falls within Little Valley territory.

Los Angeles County Sheriff's Department Deputy Yvette Reyes testified that she and her partner, Deputy Hanamaikai, responded to the 911 call. Deputy Reyes instituted a "tactical plan that had been put in place" by coordinating with other law enforcement units who were covering a two block radius around the location because they received information that one of the people at the location was somebody for whom they had been advised to look. The person they were looking for was wanted for murder, and there was an outstanding warrant for his arrest. When they arrived at the scene, Deputy Reyes saw Gonzalez, Jaimez, and two other men standing near a cul-de-sac on the 400 block of South Record Street. The deputies ordered the men to put their hands up and to stop what

5

they were doing. Two of the men complied with the order, but Gonzalez and Jaimez ran to the rear of the residence of Robles's father. Deputies Reyes and Hanamaikai detained the two men that complied with their orders, but they did not pursue Gonzalez and Jaimez because they had the assistance of a helicopter unit. Deputy Reyes participated in an evacuation of the 400 block of South Record Street. Several announcements were made ordering everyone out of the residences, and eventually Gonzalez exited the residence of Robles's father and was arrested.

Rosa Reynoso testified that in the evening of October 19, 2008, she was having a barbeque in the front of her house, and Jaimez appeared on the side of her residence. Jaimez was not invited to the barbeque, and Reynoso did not know him. (The events here are discussed in more detail *post*.) The police arrived at Reynoso's residence and Jaimez was taken into custody.

Detective Lugo testified that Little Valley was a "traditional" gang that has existed for approximately 60 years and has approximately 100 members. A gang's territory is the gang's "heart;" it is "what they fight for . . . and what they'll kill for." Little Valley's territory is bordered by Indiana Street to the west, Whittier Boulevard to the south, Downey Road to the east, and Interstate 5 to the north. In order to establish their territory, a gang must commit crimes within that territory. This creates an atmosphere of fear and intimidation, and dissuades witnesses of crimes from reporting the crimes and testifying in court. The primary activities of Little Valley include tagging, automobile thefts, narcotic sales, transportation of narcotics, burglaries, transportation of weapons, extortions, kidnapping, assaults, drive-by shootings, attempted murders, and murders.

Certified court orders of two cases in which Ilene Munoz and Jose Veira were named as defendants were introduced to establish that they had been convicted in about March 2008 of assault with a deadly weapon or assault by means likely to produce great bodily injury. Detective Lugo testified that Munoz and Viera were Little Valley gang members at the time they committed the crime. Detective Lugo did not state how he knew Munoz was a gang member, but he said that the basis for his information that Viera was gang member was that "other detectives that handled the case" had "mentioned" it.

6

The prosecutor asked Detective Lugo to assume, hypothetically, facts closely tracking the evidence concerning the shootings of Bonifacio and Griselda. Based on those facts, Detective Lugo opined that the shootings would have been committed for the benefit of, at the direction of, and in association with a criminal street gang, and would have been an effort to promote, further, or assist criminal conduct by gang members. Detective Lugo stated that the basis for his opinion was, inter alia, that a gang considers it "wrong" for someone like Bonifacio, who disassociated himself from a gang without permission, to "just show back up" in the gang's territory. It is disrespectful for someone like Bonifacio, a former low-level gang member, to refuse to attempt to procure a firearm for a well-respected gang member. When the person is asked by a gang member, "Where are you from," and responds, "nowhere," the person like Bonifacio is essentially communicating to the gang member that the person "turn[ed] his back" to the gang and is "basically telling the gang to fuck off." A shooting under the circumstances reinforces the fear and intimidation within the community. When a gang member kills another member of that gang—i.e., when the gang is "cleaning house"[4] thereby "tightening up the ship"—all of the other members of that gang "are going to know either you're in or you're out," and members of rival gangs will know that the killing gang is "serious." The shootings of Bonifacio and Griselda occurred in or near Little Valley's territory.

### b. Defendant's Evidence

Valerie Moriel, Gonzalez's girlfriend, testified that in October 2008, she was living with Gonzalez. On October 17, 2008, Gonzalez was watching his little sister at their home. Moriel left home for work that day at 6:30 a.m., and returned home at 4:00 p.m.[5]

---

[4] As used herein, the terms "house cleaning," "in-house cleaning," and "in-house shootings," are synonymous.

[5] On cross-examination, Moriel stated that she did not know of Gonzalez's whereabouts from 10:30 a.m. to 1:00 p.m.

California Department of Corrections Parole Agent Arthur Evans testified that in October 2008, Gonzalez was on parole with a condition that he was not to associate with known gang members. The parties stipulated that in October 2008, Jaimez was on parole with the same condition.

The parties stipulated that a video depicted that on October 17, 2008, at 7:32 a.m., Jaimez entered the Superior Court of Los Angeles Commonwealth courthouse. Gloria Sera-Mulet, a Superior Court of Los Angeles family law paralegal, testified that at 9:00 a.m. or 9:30 a.m. she met with Jaimez at the courthouse to assist him in preparing documents for his family law case that was pending there. The preparation of the documents took about three hours. Before Sera-Mulet went to lunch at about 1:00 p.m. she told Jaimez that she was going to lunch and he should return to her office after lunch. On cross-examination, Sera-Mulet stated that she previously testified that she did not remember whether she spoke with Jaimez between 12:00 p.m. and 1:00 p.m. The parties stipulated that a video depicted that from 1:21 p.m. to 1:28 p.m., Jaimez was standing in line at a Carl's Jr. restaurant across the street from the courthouse, and that at 1:53 p.m., Jaimez entered the Commonwealth courthouse.

c.      Prosecution Rebuttal Evidence

Detective Charles testified that Sera-Mulet told him during her October 21, 2008, interview that the preparation of the documents for Jaimez took about 90 minutes, not three hours. Sera-Mulet told Detective Charles that she worked with Jaimez from 8:30 a.m. to 10:00 a.m., directed Jaimez to go without her to another office in the courthouse, the latest Jaimez should have been in the courthouse if he went to the other office as instructed would be noon, and Jaimez returned to see her at about 2:30 p.m. A defense investigator said that driving 55 miles per hour, it took him 18 minutes to drive from the courthouse to the area in which the shooting occurred at about one p.m.

8

### 2.	The False Imprisonment of Rosa Reynoso and Dissuading Her from Reporting a Crime

As discussed below, following the first trial Jaimez was convicted of false imprisonment and dissuading a witness from reporting a crime (counts 3 and 4), but the trial court declared a mistrial as to the counts against both Jaimez and Gonzalez for the murder of Griselda in violation of section 187, subdivision (a) (count 1), and the willful, deliberate and premeditated attempted murder of Bonifacio in violation of sections 664 and 187, subdivision (a) (count 2).  The facts relating to the crimes of murder and attempted murder from the second trial are substantially the same as those in the first trial.  To avoid repetition of the facts relating to the murder and attempted murder, the facts in this section only include those relevant to Jaimez's conviction from the first trial—false imprisonment of Reynoso and dissuading her from reporting a crime.

#### a.	Prosecution Evidence

Reynoso testified that on October 19, 2008, she was having a barbeque at her residence on Langford Street.  Detective Charles testified that Reynoso's residence was approximately one block from the residence of Robles's father on South Record Street, which Detective Lugo, the prosecution's gang expert, testified was within Little Valley's territory.

Reynoso testified that during the barbeque an "uninvited" person came towards her from the rear of the property.  Reynoso told her family members that were inside the house to remain inside, locked the security gate, and returned to the outside of the house.  She told the police that this "uninvited" person, a male, told her to sit with him on the front porch, that he had a gun, and that when the police came to tell them he is her friend.  Reynoso also told the police that she did not see a gun, but that she sat on the front porch with this person because she was "scared."  The police arrested that person.

Many of Reynoso's answers to the prosecutor's questions were "I don't remember."  Reynoso testified at trial that about two weeks after the October 19, 2008, incident, she found nine bullets on her porch.  She was afraid to come to court to testify

9

in this case, and she told that to Detective Charles. Reynoso declined Detective Charles's offer to have her relocated out of the neighborhood. When Reynoso was asked on cross-examination whether she "was trying [her] best to remember everything [she] can now?," she responded, "I don't want to remember anything." When Reynoso was asked on cross-examination whether she saw "someone get arrested that night that we've been talking about . . .," she began to cry and, therefore, the trial court took a recess. Shortly after the trial resumed, Reynoso said that, "All I want to say is that I don't want to have any problems. I'm very scared. I don't want to have any problems with this man and I don't know anything."

Los Angeles County Sheriff's Department Deputy Rodney Gutierrez testified that on October 19, 2008, he responded to a call to go to the Langford Street location because "another East L.A. patrol unit received a call of gang members hanging out in the area that were wanted for a recent murder." When Deputy Gutierrez arrived at the scene a "containment" had been set up that comprised of approximately ten deputies, two two-person patrol vehicles, and an "airship." Deputy Gutierrez initially saw Jaimez in the rear of Reynoso's residence, and after about a two-hour search, Deputy Gutierrez located Jaimez on the porch of Reynoso's residence. Jaimez was arrested.

Deputy Gutierrez and his partner, Deputy Luis Alva, then spoke with Reynoso, who initially identified Jaimez as her friend. Reynoso appeared to be shaken and nervous. When Deputy Alva asked Reynoso why she was nervous or scared, Reynoso recanted her initial statement that Jaimez was her friend and told the deputies "that she was gonna come out and tell the truth to us. She was scared and—but she wanted to tell us the truth."

Deputy Gutierrez testified that Reynoso said, outside the presence of Jaimez, that when she was barbequing on her front porch, she saw Jaimez run onto her property. Jaimez was out of breath, nervous, and anxious. Reynoso was startled and told her family to lock the door and told them not to leave the house. Jaimez told Reynoso that the police were searching for him, and that she should tell them that Jaimez was her friend and they were just sitting on the porch. Jaimez told Reynoso that she could not

10

leave the front porch area, he was a Little Valley gang member, and he had a gun. Reynoso did not see the gun, but Jaimez was "cradl[ing] his waistband area." Jaimez told Reynoso that if she tried to leave, he or his gang member friends would harm her or her family. Reynoso complied with Jaimez's directive to stay on the front porch with him because she was afraid for herself and her family. Reynoso said that she was confined to the porch with Jaimez for about two hours.

Detective Charles testified that Reynoso told him before trial that she was not sure from where the nine bullets came. Reynoso said that a Hispanic man came to her residence, told her that he was Jaimez's friend, warned her not to testify, and told her that something bad would happen to her if she testified.[6] Reynoso said that she was very reluctant to testify and she would rather go to jail than testify.

An audio recording of a conversation between Jaimez and Gonzalez that occurred while they were in the same patrol car following their arrest on October 19, 2008, was played for the jury. During the conversation, Jaimez said laughing, "I was right there with my friends, some hyna. And we were eating. Well, she had a barbecue."

An audio recording of a conversation between Jaimez and Gonzalez that occurred while they were in the same jail cell was played for the jury. The following exchange occurred during the conversation: "[Jaimez:] I know them mother-fuckers are hearing us right now . . . . [¶] [Gonzalez:] Ah' fuck them. [¶] [T]hey're probably like . . . why aren't they breaking. Like they'll be expecting us to start saying something know what I mean— [Gonzalez:] Yeah. [Jaimez:] —like why haven't they said it yet because these—these fools are stupid homey."

### b. Defendant's Evidence

The parties stipulated that in October 2008, Jaimez was on parole with a condition that he was not to associate with known gang members.

---

[6] The trial court instructed the jury to consider this statement only as to Reynoso's state of mind.

11

## B.    Procedural Background

Following a trial, the jury found Jaimez guilty of the false imprisonment of Reynoso by violence in violation of section 236 (count 3), and dissuading Reynoso from reporting a crime in violation of section 136.1, subdivision (b)(1) (count 4).  The jury deadlocked on charges against both Jaimez and Gonzalez for the murder of Griselda in violation of section 187, subdivision (a) (count 1), and the willful, deliberate and premeditated attempted murder of Bonifacio in violation of sections 664 and 187, subdivision (a) (count 2), and the trial court declared a mistrial as to those counts and dismissed the jury.

As to Jaimez, the jury found true that the offenses charged in counts 3 and 4 were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote further and assist in criminal conduct by gang members in violation of  section 186.22, subdivision (b)(1)(A) as to count 3, and subdivision (b)(4) as to count 4.  The trial court denied Jaimez's oral motion for new trial, and sentenced Jaimez to state prison for a term of seven years to life.  The trial court awarded Jaimez 1025 days of actual custody credit, but did not award him any conduct credit. ~

Gonzalez was retried on counts 1 and 2.  Following the retrial, the jury found Gonzalez guilty of the murder of Griselda in violation of section 187, subdivision (a) (count 1), and the willful, deliberate and premeditated attempted murder of Bonifacio in violation of sections 664 and 187, subdivision (a) (count 2).  The jury found true that the offenses charged in each of those counts were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote further and assist in criminal conduct by gang members in violation of  section 186.22, subdivision (b)(1)(A) as to count 1, and subdivision (b)(1)(C) as to count 2.  As to both counts, the jury also found true that Gonzalez personally and intentionally discharged a firearm and proximately caused great bodily injury or death within the meaning of section 12022.53, subdivision (d).

12

The trial court sentenced Gonzalez to state prison for a term of 90 years to life, consisting of the following: on count 1, 25 years to life for the murder of Griselda, plus 25 years for the gun use enhancement; on count 2, 15 years to life for the premeditated attempted murder of Bonifacio and the gang allegation, plus 25 years to life for the gun use enhancement. The trial court awarded Gonzalez 1061 days of actual custody credit.

## DISCUSSION

### A. Gonzalez's Argument Regarding Admission of Gang Expert Testimony Concerning Shootings Between Little Valley Gang Members

Gonzalez contends that the trial court violated his rights to due process and a fair trial when it denied his request to exclude gang expert testimony concerning "in-house shootings" between Little Valley Gang members. We disagree.

#### 1. Standard of Review

"On appeal, we apply an abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1140; see *People v. Carter* (2003) 30 Cal.4th 1166, 1194 [admission of gang evidence reviewed for abuse of discretion].) "A trial court abuses its discretion when its ruling 'fall[s] "outside the bounds of reason."' [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 714.) If the erroneous admission "implicates defendant's federal constitutional rights to due process and concerns the fundamental fairness of his trial, we will apply the de novo standard of review." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 225, fn. 7 (*Albarran*).)

#### 2. Background Facts

During opening statement, the prosecutor stated, "You'll hear about the history of this gang and how a civil war, essentially, broke out within this gang where Little Valley gang members started killing Little Valley gang members and . . . this sort of killing of

13

your own kind . . . was something taking place in Little Valley around the time of our shooting.  [¶] . . . [¶]  You'll hear that because of this civil war, there was some return to sort of an old-school philosophy within the gang.  They wanted to tighten up the ship and get rid of those members who were considered weak, so somebody like Bonifacio, who left the gang and came back and wasn't participating, would be viewed as weak."  The prosecutor also stated, "and you will have a history and culture of Little Valley and the different individual's role in that gang and how their role in that gang developed a motive for this particular shooting . . . ."

Gonzalez's counsel stated during opening statement, "[T]he People will call their gang expert to tell you . . . what he believes was the motive for why the shooting happened.  [¶]  And he will say that this was a disciplinary killing, but he will not be able to offer you one single example . . . of a Little Valley member being disciplined, being assaulted or shot at for leaving the area or leaving the gang."

Gonzalez filed a motion to exclude expert testimony about the five prior gang-related shootings on the grounds that, inter alia, the evidence was irrelevant, and it was substantially more prejudicial than probative under Evidence Code section 352.  The trial court denied the motion, stating, "I [will] not allow specifics of the prior shootings, but the fact that there were prior shootings, [and] they are not going to be connected to either [Gonzalez or Jaimez], but that there were just, in general, prior shootings of Little Valley on Little Valley."  The trial court then granted the request of Gonzalez's counsel to ask the prosecutor's gang expert whether anyone had ever been arrested, tried or convicted for any of the prior shootings without it "opening the door" to the specifics about the prior shootings, stating, "I think that's reasonable."

At trial, Detective Lugo testified that when a gang member kills a member of his own gang, it is sometimes called "cleaning house " or "tightening up the ship."  One reason to "clean house" is to discipline a disloyal member.  Detective Lugo testified that if a person "disappear[s] from the gang without . . . getting permission in the modern way of doing things, and [that person] start[s] showing up, and they suspect you of doing things against the gang, [that person] would be considered disloyal, disrespectful.  [That

14

person] is not following orders. [That person does not] want to pick up where [that person] left off for the gang."

Detective Lugo testified that Little Valley "cleaned house" in 2001, involving two high-ranking gang members, June 2005, July 2005, November 2005, and December 2006. There was an arrest and conviction for the incident that occurred in 2001, and during the trial regarding that incident a Little Valley gang member testified against another Little Valley gang member. No one had ever been prosecuted for or convicted of the other four incidents. Detective Lugo was the lead investigator concerning some of those incidents and he ran into "problems with getting people to cooperate in court." Detective Lugo and other gang investigators in east Los Angeles have used the phrases "in-house cleaning" or "cleaning house" with one another concerning Little Valley.

After the introduction of evidence, the trial court instructed the jury under CALCRIM No. 1403, modified, as follows: "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose and knowledge that are required to prove the gang-related crimes and enhancements charged; [¶] or the defendant had a motive to commit the crimes charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

During closing argument, Gonzalez's counsel argued that the shootings of Bonifacio and Marcelo were not Little Valley "in-house shootings," but rather were committed by a rival gang member.

### 3. Analysis

Gonzalez contends that the evidence of the prior Little Valley "in-house shootings" was not relevant. "'"Only relevant evidence is admissible [citations], and all relevant evidence is admissible unless excluded under the federal or California

15

Constitution or by statute. [Citations.] Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends '"logically, naturally, and by reasonable inference" to establish material facts . . . . [Citations.]' [Citation.] The trial court has broad discretion in determining the relevance of evidence [citations] . . . . [Citations.]" [Citation.]' [Citation.]" (*People v. Carter, supra,* 36 Cal.4th at pp. 1166-1167.)

Contrary to Gonzalez's contention, the evidence of Little Valley's prior "in-house shootings" was relevant to establish that the attempted murder of Bonifacio was gang related and that Gonzalez had a motive to commit the crimes charged—i.e., to discipline a member for leaving the gang without permission.

Gonzalez contends that the evidence was irrelevant because it was unknown who committed the prior Little Valley shootings or the reason they occurred. Detective Lugo, however, testified that the persons who committed the prior Little Valley shootings were Little Valley gang members. Detective Lugo was the lead investigator concerning some of the incidents of Little Valley cleaning house. Detective Lugo testified that when a gang member kills a member of his own gang, it is sometimes called "cleaning house," and he and other gang investigators had used the phrases "cleaning house" and "in-house cleaning" with one another concerning Little Valley.

Detective Lugo also testified about the reasons that the incidents of cleaning house occur—to discipline a disloyal member. He testified that they occur when a person "disappear[s] from the gang without . . . getting permission in the modern way of doing things, and [that person] start[s] showing up, and they suspect you of doing things against the gang, [that person] would be considered disloyal, disrespectful. [That person] is not following orders. [That person does not] want to pick up where [that person] left off for the gang."

Gonzalez contends that the evidence was substantially more prejudicial than probative. "Relevant evidence may nonetheless be excluded under Evidence Code section 352 at the trial court's discretion if 'its probative value is substantially

16

outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' . . . (*People v. Ledesma* (2006) 39 Cal.4th 641, 701.)" (*People v. Richardson* (2008) 43 Cal.4th 959, 1000-1001.) "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638; see *People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)

Gonzalez contends that the evidence was prejudicial because "the testimony on the prior unresolved murders amounted to guilt by association. . . . Undoubtedly, the jury made the connection that not only was [Gonzalez] violent, but he was probably somehow involved in the prior unsolved murders." The jury, however, was instructed that the evidence of gang activity was admitted for the limited purpose of proving the gang enhancement and to show motive, and that it could not be considered for any other purpose, including as character evidence. We presume the jury followed the trial court's instructions. (*People v. Avila* (2009) 46 Cal.4th 680, 719; *People v. Bennett* (2009) 45 Cal.4th 577, 596; *People v. Johnson* (2009) 180 Cal.App.4th 702, 710.) It is almost an "'invariable assumption of the law that jurors follow their instructions.' [Citation.] '[We] presume that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.' [Citation.]" (*United States v. Olano* (1993) 180 Cal.App.4th 702, 740.)

Gonzalez contends that the evidence of Little Valley's "in-house shootings" was cumulative to Detective Lugo's testimony "that gang members could be disciplined or killed for many different reasons," including for leaving the gang without permission, and disrespecting a higher ranking gang member. Evidence of the incidents of Little Valley cleaning house was not cumulative, warranting exclusion. Gonzalez's defense was that the shootings of Bonifacio and Marcelo were not "in-house shootings," but rather were committed by a rival gang member. Evidence of Gonzalez's motive to commit the

17

crimes, therefore, was essential to the prosecution's case against him. In addition, the introduction of the contested evidence did not involve an undue consumption of time because the trial court precluded the prosecutor from eliciting testimony about the specifics of the prior Little Valley intra-gang shootings, while allowing Gonzalez's counsel to ask the prosecutor's gang expert whether anyone had ever been arrested, tried or convicted for any of the prior shootings without it "opening the door" to the specifics about the prior shootings.

"'Evidence that is identical in subject matter to other evidence should not be excluded as "cumulative" when it has greater evidentiary weight or probative value.' (*People v. Mattson* (1990) 50 Cal.3d 826, 871 [268 Cal.Rptr. 802, 789 P.2d 983].)" (*People v. Filson* (1994) 22 Cal.App.4th 1841, 1851, overruled on other grounds as stated in *People v. Martinez* (1995) 11 Cal.4th 434, 452.) Evidence of actual instances of Little Valley's cleaning house has greater evidentiary weight and probative value than Detective Lugo's testimony that gang members "could" be disciplined or killed. Accordingly, the trial court did err in admitting the evidence.

**B.    Gonzalez's Argument That His Right to Confrontation Was Violated Because Detective Lugo's Expert Testimony Was Based on Inadmissible Hearsay.**

Relying primarily on *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), Gonzalez contends that the trial court violated his right to confrontation under the Sixth Amendment by allowing Detective Lugo, in his expert testimony, to rely on inadmissible hearsay statements of others. We disagree.

*1.    Forfeiture*

The Attorney General contends that Gonzalez forfeited his contention that his right to confrontation under the Sixth Amendment as articulated by *Crawford*, *supra*, 541 U.S. 36 was violated by the trial court allowing Detective Lugo's expert testimony to be

18

based on inadmissible hearsay statements because Gonzalez failed to object to Detective Lugo's testimony on this ground.

"When a party does not raise an argument [before the trial court], he may not do so on appeal. (*People v. Raley* (1992) 2 Cal.4th 870, 892 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People v. Benson* (1990) 52 Cal.3d 754, 782, fn. 5 [276 Cal.Rptr. 827, 802 P.2d 330].)" (*People v. Clark* (1993) 5 Cal.4th 950, 988, fn. 13, disapproved on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *In re Michael L.* (1985) 39 Cal.3d 81, 88 ["Objections not presented to the trial court cannot be raised for the first time on appeal"].) "'The reason for this rule is that "[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided." [Citations.] "[T]he forfeiture rule ensures that the opposing party is given an opportunity to address the objection, and it prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error." [Citation.]' (*People v. French* (2008) 43 Cal.4th 36, 46 [73 Cal.Rptr.3d 605, 178 P.3d 1100].)" (*People v. Hawkins* (2012) 211 Cal.App.4th 194, 203.)

Gonzalez concedes that he "failed to object [to] the gang's expert testimony on Confrontation grounds or under *Crawford v. Washington, supra,* 541 U.S. 36." Gonzalez contends, however, that such an objection was not required because it would have been futile for him to make such an objection. (*People v. Sandoval* (2007) 41 Cal.4th 825, 837, fn. 4.) Citing *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1427 and *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1210, Gonzalez argues the objection would have been futile because appellate courts have held that an expert's opinion that is based on hearsay statements does not offend the confrontation clause, and under the principles of stare decisis, the trial court would be required to follow those opinions. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

*People v. Ramirez, supra*, 153 Cal.App.4th at page 1427, relied on *People v. Thomas*, *supra*, 130 Cal.App.4th 1202, and the court in *People v. Hill* (2011) 191 Cal.App.4th 1104, disagreed with *People v. Thomas*, *supra*, 130 Cal.App.4th 1202, but

nevertheless felt it was bound by *People v. Gardeley* (1996) 14 Cal.4th 605, 618 (*Gardeley*). (*People v. Hill*, *supra*, 191 Cal.App.4th at pp. 1121-1122, 1131.) *Gardeley*, decided before recent United States Supreme Court confrontation clause authorities, held that the evidence could not be excluded as hearsay. It did not determine whether the evidence was testimonial hearsay subject to the confrontation clause.

Gonzalez's contention that his right to confrontation under the Sixth Amendment to the United States Constitution was violated is a federal issue. At the time Detective Lugo testified, the state of the law on the confrontation clause was not fixed. (See *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [180 L.Ed.2d 610, 131 S.Ct. 2705] (*Bullcoming*); *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*); see also *Williams v. Illinois* (2012) 567 U.S. ___ [183 L.Ed.2d 89, 132 S.Ct. 2221])

In order for defendant to preserve his contention that his right to confrontation was violated, he must have objected on that basis. He did not and, therefore, defendant forfeited his contention.

### 2. *Confrontation Clause*

Even if defendant had objected that his right to confrontation was violated, in view of the applicable opinions, which, as we note, cannot be applied to the issue here with any certainty, and the state of the record, we conclude there was not a sufficient showing of a violation. The confrontation clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The United States Supreme Court held in *Crawford*, *supra*, 541 U.S. 36 at pp. 53-54 that the confrontation clause "bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" (*Davis v. Washington* (2006) 547 U.S. 813, 821.)

Although Gonzalez contends that his constitutional right to confrontation was violated when Detective Lugo testified about Little Valley's primary criminal activities, that Munoz was a Little Valley gang member at the time she committed the crime of

assault, and that "in-house shootings" occurred between Little Valley Gang members, Gonzalez does not identify the person or persons he contends he had a right to confront, nor does he specify the out-of-court statements upon which Detective Lugo purportedly based his testimony and upon which Gonzalez relies. Gonzalez concedes that "the specific source of [Detective Lugo's] information" about Little Valley's primary criminal activities "is unclear," he "did not state how he knew [that Munoz] was a gang member," and "it is not clear from Detective Lugo's testimony the source of his information regarding" the Little Valley "in-house shootings." Similarly, Gonzalez contends that his right to confrontation was violated when Detective Lugo testified that he was familiar with the facts of the assault committed by Munoz and Viera on about March 18, 2008, because he "spoke to the investigator," but neither Gonzalez nor the record identify the investigator, the investigator's statements, or the circumstances under which the investigator's statements were made. Based on the record, we cannot say that Detective Lugo's testimony that was purportedly based on certain unspecified out-of-court statements made by unspecified sources violates Gonzalez's right to confrontation.

Gonzalez also contends that his constitutional right to confrontation was violated when certified court orders of two cases in which Munoz and Veira were named as defendants were introduced into evidence to establish that they had been convicted of assault with a deadly weapon or assault by means likely to produce great bodily injury. Gonzalez, however, did not establish that the certified court documents served as a basis for Detective Lugo's testimony. Detective Lugo merely testified that he is aware of the convictions of Munoz and Veira, but he did not state the basis of his awareness. In addition, assuming Detective Lugo did rely on these certified court documents in testifying, Gonzalez's right of confrontation was not violated because the documents were certified court records, and there is no legitimate basis upon which Gonzalez may cross-examine the person who prepared them.

As noted above, the United States Supreme Court held in *Crawford*, *supra*, 541 U.S. 36 at pp. 53-54 that the confrontation clause bars the admission of testimonial statements of an out-of-court witness who defendant was not permitted to cross-examine,

21

but "[t]he *Crawford* court did not define the term 'testimonial,' and the United States Supreme Court has still not agreed upon a definition." (*People v. Holmes* (2012) 212 Cal.App.4th 431, 437.) "Although the high court has not agreed on a definition of 'testimonial,' testimonial out-of-court statements have two critical components. First, to be testimonial, the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*People v. Dungo* (2012) 55 Cal.4th 608, 619; *People v. Lopez* (2012) 55 Cal.4th 569, 581-582.) "It is now settled in California that a statement is not testimonial unless both criteria are met." (*People v. Holmes*, *supra*, 212 Cal.App.4th at p. 438.)

Gonzalez contends that his right to confrontation was violated when Detective Lugo testified that Viera was a Little Valley gang member at the time he committed the crime of assault because Detective Lugo said that the basis for his information was that "other detectives that handled the case" had "mentioned" it. The record does not establish the circumstances under which the other detectives "mentioned"—whether directly to Detective Lugo, overheard by him, or otherwise—that Viera was a Little Valley gang member. Gonzalez did not establish any requisite degree of formality or solemnity of the out-of-court "statement" made by the other detectives. "[T]o be testimonial the out-of-court statement must have been made with some degree of formality or solemnity. (See *Crawford*, *supra*, 541 U.S. at p. 51 ['An accuser who makes a formal statement to government officers bears testimony . . .']; *Melendez-Diaz*, *supra*, 557 U.S. at p. 310 [stressing that each of the laboratory certificates determined to be testimonial was a "'solemn declaration or affirmation'"]; *Bullcoming, supra, 564 U.S.* ___ [131 S.Ct. at p. 2717] [the laboratory certificate found to be testimonial was "'formalized" in a signed document. . . referring to . . . rules' that made the document admissible in court (citation omitted)] . . . ." (*People v. Lopez*, *supra*, 55 Cal.4th at p. 582.) We conclude, therefore, based on the record, that the detective having "mentioned" that Viera was a gang member was not testimonial and Gonzalez's constitutional right to confrontation was not violated. Because we conclude that Gonzalez did not establish any

requisite degree of formality or solemnity of the out-of-court "statement," we do not reach the issue of whether its primary purpose pertained "in some fashion to a criminal prosecution." (*People v. Dungo*, *supra*, 55 Cal.4th at p. 619 [a statement is testimonial only if both criteria are met].)

### C.    Gonzalez's Argument Regarding His Sentence on Count 2

Gonzalez contends that the trial court erred by imposing an unauthorized sentence term of "15 years to life" on count 2. Gonzalez contends that, "[I]nstead, the [trial] court should have sentenced [defendant] to life with the possibility of parole with a minimum of 15 years before being eligible for parole." The Attorney General concedes that Gonzalez's abstract of judgment must be corrected to reflect that Gonzalez's sentence is a term of life in prison with a minimum wait for parole of 15 years.

Gonzalez was convicted on count 2—willful, deliberate, and premeditated attempted murder in violation of sections 187 subdivision (a) and 664—and the jury found true the gang enhancement allegation under section 186.22, subdivision (b)(1)(C) and the firearm use enhancement allegation under section 12022.53, subdivision (d). The trial court sentenced defendant to state prison for a term of 40 years to life, consisting of 15 years to life for premeditated attempted murder under sections 187, subdivision (a), 664, and 186.22, subdivision (b)(5), enhanced by an additional 25 years to life under section 12022.53, subdivision (d), to be served consecutively. As to defendant's sentence of 15 years to life, the trial court stated, "As to count 2 [premeditated attempted murder], . . . [Gonzalez] is ordered to serve a consecutive 15-year-to-life term. The effect of 186.22, (b)(1)(5) becomes a parole eligibility only statute at that point." The minute order provides in part, "As to count 2: Defendant to serve 15 years to life. [¶] The court finds the premeditation makes this a life count, and the 186.22(B)(1)(5) mandates a minimum of 15 years in state prison on life counts." The abstract of judgment provided in part, "15 years to life on count[] 2."

Section 664, subdivision (a) provides in relevant part, "[I]f the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty

23

of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole." Section 186.22, subdivision (b)(5) provides in relevant part, "[A]ny person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served."

"The effect of section 186.22, subdivision (b)(5) is to increase the minimum parole eligibility date on a willful, deliberate, and premeditated attempted murder sentence. Absent a determination the accused is subject to the enhanced sentencing provisions of section 186.22 or some other provision of law, a sentence for willful, deliberate, and premeditated murder is for a life term with a minimum wait for parole of seven years. (§ 3046, subd. (a)(1).) However, once a finding pursuant to section 186.22, subdivision (b)(5) is returned, the minimum wait for parole eligibility under a life sentence is increased to 15 years.[7] [Citations.]" (*People v. Salas* (2001) 89 Cal.App.4th 1275, 1280-1281, fn. omitted.)

Although the trial court stated that as to count 2 Gonzalez was sentenced to serve a 15 year to life term, and the abstract of judgment provided that Gonzalez is sentenced to "15 years to life on count[] 2," as noted above, Gonzalez's correct sentence should have been life with a 15 year minimum eligible parole date.

### D. Gonzalez's Argument Regarding His Abstract of Judgment

Gonzalez contends that the abstract of judgment should be amended to correctly reflect the jury's true finding on the firearm use enhancements. The Attorney General agrees.

The abstract of judgment misstates the firearm use enhancements imposed on counts 1 and 2. It provides that the enhancements on those counts are imposed under

---

7    Because the offense of willful, deliberate, and premeditated attempted murder "is a violent felony [under 186.22, subdivision (b)(1)(C)] that is punishable by imprisonment in the state prison for life [it] therefore is not subject to a 10-year enhancement under section 186.22(b)(1)(C)." (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004.)

"12022.53(D)(E)(1) PC," but the jury found true the firearm use enhancements under section 12022.53, subdivision (d). The abstract of judgment is to be corrected as to counts 1 and 2 by deleting the reference to the firearm use enhancements under "12022.53(D)(E)(1) PC," and to include instead that the firearm use enhancements are imposed under section 12022.53, subdivision (d).

      **E.**     **Jaimez's Argument That There is Insufficient Evidence to Support the Jury's True Findings for the Gang Enhancements.**

Jaimez contends that there is insufficient evidence to support the jury's finding that he falsely imprisoned Reynoso and dissuaded her from reporting a crime for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. We disagree.

      *1.*     *Standard of Review*

"'In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question we ask is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."' ([*People v*.] *Rowland* [(1992)] 4 Cal.4th [238,] 269 . . . .) We apply an identical standard under the California Constitution. (*Ibid*.) 'In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court "must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."' (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].)" (*People v. Young* (2005) 34 Cal.4th 1149, 1175.) In reviewing the sufficiency of the evidence, "a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]" (*Id*. at p. 1181.)

We will reverse for insufficient evidence only if "'"'"upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'"'"'" (*People v. Manriquez* (2005) 37 Cal.4th 547, 577.) This standard of review applies to gang enhancement findings. (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1508; *People v. Villalobos* (2006) 145 Cal.App.4th 310, 321-322.)

### 2. *Background Facts*

Detective Lugo testified that Jaimez and Gonzalez were high level members of the Little Valley gang. Detective Lugo testified that the primary activities of Little Valley include "anything from graffiti, tagging, to sales of narcotics to sales and transportation of weapons, extortion, burglaries, grand thefts, robberies, assaults, physical assault, assault using weapons, shootings, drive-bys, kidnappings, attempted murders, murders, and anything that falls within that realm."

There is substantial evidence to support the gang enhancement. According to Detective Lugo, it is important to gang members that people in the community who are not gang members respect and fear them. Detective Lugo testified, "[T]hat way people will not come forward and help out . . ., will not be witnesses to an incident, will not call in an incident, [and] will not cooperate with police due to fear." Witnesses that live within a gang's territory often recant earlier statements because they "fear for their lives and the lives of their loved ones."

The prosecutor asked Detective Lugo to assume, hypothetically, facts closely tracking the evidence concerning the false imprisonment of Reynoso and dissuading her from reporting a crime. Based on those facts, Detective Lugo opined that those crimes against Reynoso would have been committed for the benefit of, at the direction of, or in association with a criminal street gang. Detective Lugo stated that the basis for his opinion was, "[T]he fear and the intimidation [the gang] expect[s] to have within their gang turf and territory. When a gang member runs, approaches a citizen of the community, identifies himself who they are, who they're affiliated with, they expect they will cooperate due to the fear and intimidation that they have established within the

26

community.  [¶]  That means they expect of that person, expect full cooperation . . . in order to elude capture from police.  [¶]  He's hoping, this individual is hoping to elude capture by police due to the fact that this person will do what they are told because that person, once he establishes himself as a member of that gang where the citizen lives with him, he has the backing of all of the members of the gang and possibly their family members."  The following exchange then occurred: "[Prosecutor:] So the fact this individual evokes or says that he is part of Little Valley, he's utilizing the backing of the gang, is that what you were saying?  [¶]  [Detective Lugo:]  Yes.  [¶]  [Prosecutor:] Okay.  When you say 'backing of the gang,' what do you mean?  [¶]  That means that at any given time any gang member associated with that particular gang can retaliate against that citizen if they don't cooperate or any of their family members."  Deputy Lugo testified that the witness intimidation and false imprisonment of the homeowner described in the hypothetical will also further, promote and assist criminal conduct by the gang because "other gang members from that gang will expect that they can also do the same things within that community as long as they are associated with that particular gang.  [¶]  They will expect that the word gets out on the street by the good citizenship of that community and they will know that this gang is to be feared, it is to be obeyed at all costs."

　　　　　*3.　　Analysis*

　　Section 186.22, subdivisions (b)(1) and (b)(4) provide for a sentence enhancement for any person who is convicted of a felony "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."  A gang expert properly may testify about gang affiliation and activity where such evidence is relevant to an issue of motive or intent.  (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1518; *People v. Killebrew* (2002) 103 Cal.App.4th 644, 657 (*Killebrew*), disapproved on another point in *People v. Vang* (2011) 52 Cal.4th 1038, 1047.)  A gang expert properly may testify about "whether and how a crime was committed to benefit or promote a gang."  (*Killebrew*,

27

*supra*, 103 Cal.App.4th at p. 657.)  Similarly, a gang expert may testify about whether a defendant acted for the benefit of a gang, even though the question is an ultimate factual issue in the case, if such matters are beyond the jury's common experience.  (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506-509; *Killebrew*, *supra*, 103 Cal.App.4th at p. 651, citing Evid. Code, § 805 ["Otherwise admissible expert opinion testimony which embraces the ultimate issue to be decided by the trier of fact is admissible"].)  "'Expert opinion that particular criminal conduct benefited a gang' . . . can be sufficient to support the . . . gang enhancement.  (*People v. Albillar* [(2010)] 51 Cal.4th [47,] 63.)"  (*People v. Vang*, *supra*, 52 Cal.4th at p. 1048.)

Detective Lugo opined that the false imprisonment of Reynoso and dissuading her from reporting a crime would have been committed for the benefit of, at the direction of, or in association with a criminal street gang.  Reynoso's residence was within Little Valley's territory, and detective Lugo testified that Jaimez and Gonzalez were high level members of the Little Valley gang.  Detective Lugo testified that in order for a gang to establish their territory, it must commit crimes within that territory, creating an atmosphere of fear and intimidation that dissuades witnesses of crimes from reporting the crimes and testifying in court.  He said that it is important to gang members that people in the community who are not gang members respect and fear them—"that way people will not come forward and help out . . ., will not be witnesses to an incident, will not call in an incident, [and] will not cooperate with the police due to fear."  He added that witnesses that live within a gang's territory often recant earlier statements because they "fear for their lives and the lives of their loved ones."

Reynoso testified that upon seeing the "uninvited" person, later identified as Jaimez, on her property, she told her family members to stay in the house and she locked the security gate.  Reynoso told the police that Jaimez told her he had a gun and directed her to tell the police that he was her friend.  Although she did not see the gun, Reynoso sat on her front porch with Jaimez because she was "scared."  Deputy Gutierrez testified that Reynoso later advised him that Jaimez told Reynoso that the police were searching

for him, he was a Little Valley gang member, and Jaimez or his gang member friends would harm Reynoso or her family if she tried to leave.

Even at the time of trial Reynoso testified that she was afraid to testify in this case. Many of Reynoso's answers to the prosecutor's questions asked during the trial were "I don't remember." During trial she began to cry, and she said that, "All I want to say is that I don't want to have any problems. I'm very scared. I don't want to have any problems with this man and I don't know anything."

Jaimez contends that he "invoked his gang affiliation for his own personal reasons in an unsuccessful attempt to avoid arrest, *probably* because he had violated a condition of his recent parole by associating with Gonzalez." (Italics added.) A reasonable jury, however, could conclude that Jaimez falsely imprisoned Reynoso and intimidated her in order to avoid being apprehended by the police to protect his fellow gang member, Gonzalez, from murder charges—i.e., a benefit to the gang. Detective Lugo testified that in order for a gang to establish their territory, it must create an atmosphere of fear and intimidation that dissuades witnesses of crimes from reporting the crimes and testifying in court.

F.      **Jaimez's Argument Regarding the Trial Court Having Erred in Admitting Expert Testimony of Prior Shootings Between Little Valley Gang Members and Denying Jaimez's Motion for New Trial Made on that Basis.**

Jaimez contends that the trial court abused its discretion in admitting expert testimony of prior shootings between Little Valley gang members and denying Jaimez's motion for new trial made on that basis. We disagree.

1.      *Standard of Review*

As noted above, "we apply an abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1140; *People v. Carter*, *supra*, 30 Cal.4th at p. 1194.) "[W]e independently review

orders denying a motion for new trial to determine if prejudicial trial error occurred (*People v. Ault* (2004) 33 Cal.4th 1250, 1261 [17 Cal.Rptr.3d 302, 95 P.3d 523]).'" (*People v. Mayham* (2013) 212 Cal.App.4th 847, 850.)  If the erroneous admission "implicates defendant's federal constitutional rights to due process and concerns the fundamental fairness of his trial, we will apply the de novo standard of review." (*Albarran*, *supra*, 149 Cal.App.4th at p. 225, fn. 7.)

### 2.    *Procedural and Background Facts*

On or about December 6, 2008, Jaimez filed a motion to exclude gang expert testimony seeking to exclude gang expert testimony concerning prior shootings between Little Valley gang members.[8]  The motion sought to exclude the evidence as being more prejudicial than probative.  The prosecution opposed the motion arguing the evidence was relevant to, inter alia, the motive for the murder and attempted murder—i.e., to discipline a member for leaving the gang without permission.  The trial court ruled that the prosecution could elicit testimony that there had been shootings between Little Valley gang members, but prohibited eliciting evidence of the details of each incident, stating, "[W]e are not going to have separate trials on each of these prior incidents . . . .  Under [Evidence Code section] 352, it would be time consuming and we would have a mini trial in each of these other cases."

Detective Lugo testified that "every so often" Little Valley engaged in an "in-house cleaning"—shootings between Little Valley gang members.  This process began after an incident in January 2001 in which one Little Valley member was killed and another shot by three other Little Valley members.  That incident was of special significance to Little Valley in that it started what Detective Lugo refers to as a "Civil

---

[8]    We granted Jaimez's motion to augment the record on appeal to augment the record to include the motion to exclude.  The motion to exclude does not contain a file stamp from the trial court, but a proof of service is attached to it stating that it was served on December 6, 2008, and the parties and the trial court referred to it during trial on December 7, 2010.

War" or "in-house beefs." Detective Lugo testified that subsequent Little Valley "in-house shootings" occurred: one in 2003, three in 2005, and one in December 2006.

Detective Lugo testified that people were convicted of the January 2001 incident. No one had been prosecuted for the remaining instances of "in-house shootings" referred to above, but Detective Lugo had "personal dealings" with the investigation of each of them and obtained "gang intelligence" about them.

Detective Lugo testified that the instances of Little Valley's "in-house cleanings" were related to "tightening up the ship"—keeping the gang members in order, making sure they followed the rules of the gang, and stayed loyal to the gang. Hispanic gangs generally engage in such "in-house cleanings" against members perceived to be "snitch[es]," or members who refuse to follow orders, disrespect well-respected gang members, or leave the gang.

After the introduction of evidence, the trial court instructed the jury under CALCRIM No. 1403, as modified, as follows: "You may consider evidence of gang activity only for the limited purpose of deciding whether: The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements; [¶] or the defendant had a motive to commit the crimes charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

After the jury rendered its verdict, finding, inter alia, that Jaimez guilty of the false imprisonment and dissuading a witness from reporting, and being deadlocked on whether Jaimez was guilty of murder and attempted murder, Jaimez made an oral motion for new trial contending that he did not receive a fair trial because, inter alia, there was speculative evidence that Little Valley members killed other members of the gang, which had no relevance to the crimes of false imprisonment and dissuading a witness. The trial court denied the request for a new trial, stating that, inter alia, "As for receiving a fair

31

trial, it's clear from the fact that these jurors did not convict the defendant on count 1, a murder charge, and count 2, an attempted murder charge, that he did receive a fair trial. They were very clearly able to distinguish the facts in the case. They were able to rationally analyze all the facts in the case. They were able to distinguish between his various crimes and that the defendant did receive a fair trial. The rulings of the court were according to the law, and I will deny the request for a new trial."

### 3. Analysis

#### a. Forfeiture

The Attorney General contends that Jaimez forfeited his contention that the trial court abused its discretion in denying his motion to exclude gang expert testimony concerning prior shootings between Little Valley gang members by failing to raise this claim in his opening brief. We disagree.

In Jaimez's opening brief, he discussed that he had made the motion to exclude objecting to the gang expert's prospective testimony regarding Little Valley's "intra-gang killings between 2001 and 2006," his counsel's argued the motion at the hearing on the matter, the trial court ruled on the motion, and on appeal he made a motion to augment the record to include the motion to exclude in it. In Jaimez's opening brief, he also stated that the trial court erred by, inter alia, "admitting the testimony as to Little Valley's violent history of 'in-house cleaning' in the first place," and argued the basis upon which he contended the trial court abused its discretion by admitting the testimony.

The Attorney General also contends that Jaimez forfeited his contention that the trial court erred in denying his motion for new trial regarding the trial court's admission of gang expert testimony concerning prior shootings between Little Valley gang members because "he did not present this specific claim in his [oral] motion for new trial before the trial court." Jaimez's counsel, however, orally moved for new trial stating, inter alia, "[I]t was impossible for my client to receive a fair trial based on . . . the fact that so much evidence or so much speculation in the form of evidence and opinion came in in terms of

32

gang functions, in terms of killing other members of the gang for leaving . . . ." Jaimez did not forfeit his contention.

>   b.      Expert Testimony of Prior Little Valley's Intra-Gang Shootings

Jaimez contends that the admission of the gang expert testimony concerning prior shootings between Little Valley gang members had minimal probative value and was prejudicial. Whether we apply the abuse of discretion standard of review or the no novo standard, the trial court did not err.

At the first trial, Jaimez and Gonzalez were both on trial for murder and attempted murder, and the prosecutor's theory of the case was that the attempted murder was an "in-house shooting." The evidence was relevant to establish that the attempted murder of Bonifacio was gang related and whether the defendants had a motive to commit the crimes charged. Detective Lugo testified that the instances of "in-house cleanings" were related to the gang keeping its members in order, and to make sure they followed the rules of, and stayed loyal to, the gang. He said that Hispanic gangs generally engage in such shootings against its members who disrespect well-respected gang members or leave the gang.

Jaimez contends that the challenged evidence was inadmissible "to show that because gangs have engaged in crimes like the ones charged at trial, . . . defendant must have committed the crime." Jaimez also argues that he was prejudiced by the admission of the evidence of prior shootings between Little Valley gang members because it was reasonably probable that "the jury based its findings that the gang enhancements were true on the 'intimidation' that Detective Lugo testified about [i.e., that the prior instances of 'in-house cleanings'] . . . rather than finding [that] the 'intimidation for the benefit of the gang' was [based on his] crimes against Reynoso . . . ." Relying on *Albarran, supra,* 149 Cal.App.4th 214, Jaimez argues, therefore, that he was prejudiced by the introduction of evidence of the prior Little Valley's intra-gang shootings resulting in a fundamentally unfair trial.

In *Albarran*, *supra*, 149 Cal.App.4th 214, defendant was convicted of attempted murder, shooting at an inhabited dwelling (the home of Michael Bacelis), and attempted kidnapping for carjacking. The prosecutor's gang expert testified that the defendant's gang committed a number of criminal offenses, including robberies, drive-by shootings, car-jackings, and felony vandalism, and that gang members gain respect by committing crimes and intimidating people. (*Id*. at p. 221.)

The court in *Albarran*, *supra*, 149 Cal.App.4th 214, held that there was insufficient evidence to prove that the purpose of the charged crimes was to gain respect among other gang members, stating, "In our view, however, there was insufficient evidence to support the contention that this shooting was done with the intent to gain respect." (*Id*. at p. 227.) The court reasoned that "the motive for the underlying crimes, in particular the shooting at Bacelis's house, was not apparent from the circumstances of the crime" because the shooting occurred at a private birthday party for Bacelis's cousin, Bacelis's gang did not have any known or relevant gang rivalries, and although the prosecution's gang expert testified that a gang member gains respect if his identity—or the identity of his gang—becomes known to the victims within the gang community and/or the neighborhood, there was no evidence there that the victim in that case knew the identity of the defendant or his gang. (*Ibid*.) "There is nothing inherent in the facts of the shooting to suggest any specific gang motive. In the final analysis, the only evidence to support the respect motive is the fact of [the defendant's] gang affiliation." (*Ibid*., fn. omitted.)

The court in *Albarran*, *supra*, 149 Cal.App.4th 214, found that "the gang evidence, i.e., threats against police, reference to the Mexican Mafia, and descriptions of other crimes committed by other gang members, was irrelevant, cumulative and presented a substantial risk of undue prejudice. The paramount function of this evidence was to show [the defendant's] criminal disposition . . . ." (*Id*. at p. 228.) But, the court explained, "'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citations.] Only under such circumstances can it be

34

inferred that the jury must have used the evidence for an improper purpose.' [Citation.]" (*Id*. at p. 229.)

The trial court determination that the introduction of the challenged evidence was not substantially more prejudicial to Jaimez than probative was not an abuse of discretion. Here, in contrast to *Albarran*, *supra*, 149 Cal.App.4th 214, the challenged evidence had a legitimate purpose at trial— it was directly relevant to establish that the attempted murder of Bonifacio was gang related and whether defendants had a motive to commit the crimes charged. The instances of the Little Valley's "in-house cleanings" were related to the gang keeping its members in order, and making sure they followed the rules of, and stayed loyal to, the gang. Detective Lugo testified that a gang's "in-house cleanings" also occur against the gang's members who disrespect well-respected gang members or leave the gang. There was evidence that Bonifacio left the Little Valley gang without the gang's "permission," and disrespected "Nani," a well-respected gang member.

In addition, the trial court prohibited eliciting the details of each incident of Little Valley's intra-gang shootings, and the jury was instructed that the evidence of gang activity was admitted for the limited purpose of proving the gang enhancement and to show motive, and that it could not be considered for any other purpose, including as character evidence. As noted above, we presume the jury followed the trial court's instructions. (*People v. Avila*, *supra*, 46 Cal.4th at p. 719; *People v. Bennett*, *supra*, 45 Cal.4th at p. 596; *People v. Johnson*, *supra*, 180 Cal.App.4th at p. 710.)

### G.    Jaimez is Entitled To Presentence Conduct Credit

Jaimez was convicted of false imprisonment in violation of section 236, and witness dissuasion in violation of section 136.1, and the jury found true that both offenses were committed for the benefit of a criminal street gang under various subparts of section 186.22, subdivision (b). The trial court awarded Jaimez 1, 025 days of actual custody credit, but did not award him any conduct credit because "[t]here is no good time/work time credits [*sic*] on a life sentence." In his opening brief, Jaimez contends that the trial

35

court erred because he was entitled to presentence conduct credit. (*People v. Brewer* (2011) 192 Cal.App.4th 457, 462; see *People v. Duff* (2010) 50 Cal.4th 787, 793 ["[t]he circumstance that a defendant is sentenced to an indeterminate sentence does not preclude the earning of presentence conduct credit"].) Jaimez concedes that his presentence conduct credit is limited to 15 percent under section 2933.1, but calculates that he is entitled to 154 days of presentence custody credit. The Attorney General agrees that Jaimez is entitled to presentence conduct credit, but contends that under section 2933.1 he is entitled to 153 days of credit, not 154 days. In his reply brief, Jaimez does not dispute the Attorney General's contention that he is only entitled to 153 days of credit. We hold that Jaimez is entitled to 153 days of presentence custody credit.

Section 4019 authorizes an award of presentence conduct credit, but under section 2933.1, notwithstanding section 4019, a defendant's presentence conduct credit is limited to 15 percent of his actual days of presentence confinement. Fifteen percent of 1,025 days totals 153.75 days. Because Jaimez can accrue as presentence conduct credit no more than 15 percent of his actual days of presentence confinement, he is entitled to 153 days of presentence conduct credit, not 154 days as he contends.

## DISPOSITION

Gonzalez's abstract of judgment shall be corrected by stating that he is sentenced on count 2 to a life term with a 15 year minimum eligible parole date, instead of a term of "15 years to life," and the firearm use enhancements are imposed under section 12022.53, subdivision (d) instead of under "12022.53(D)(E)(1) PC;" and Jaimez's abstract of judgment shall be corrected to provide that he is entitled to 153 days of presentence conduct credit. We otherwise affirm the judgments.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, Acting P. J.


We concur:


KRIEGLER, J.


O'NEILL, J. *

---

*    Judge of the Ventura Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

37